# Nos. 15-1071 & 15-1073

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

————————————

### BRUCE A. HAUPTMAN,

**Petitioner-Appellant**

### v.

### COMMISSIONER OF INTERNAL REVENUE,

**Respondent-Appellee**

————————————

## ON APPEAL FROM THE DECISIONS OF
## THE UNITED STATES TAX COURT

————————————

## BRIEF FOR THE APPELLEE

————————————

CAROLINE D. CIRAOLO
  *Acting Assistant Attorney General*

JOAN I. OPPENHEIMER          (202) 514-2954
RICHARD CALDARONE            (202) 514-2947
  *Attorneys, Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

# SUMMARY OF THE CASE AND WAIVER OF ARGUMENT

This case concerns whether the Internal Revenue Service abused its discretion by rejecting Bruce A. Hauptman's offer in compromise, which sought to settle over $15 million in unpaid federal income tax, interest, and penalties for $500,000, as not in the best interest of the Government. The IRS did so because it found that Hauptman had concealed taxable income, failed to disclose his financial situation fully in connection with his offer, and failed to prioritize the payment of his tax liability. Those findings were issued after full consideration of Hauptman's position and are supported by the record. The rejection of Hauptman's offer therefore was not an abuse of discretion, as the Tax Court correctly determined.

Pursuant to Eighth Circuit Rule 28A(i)(1), counsel for the Commissioner respectfully inform the Court that they believe oral argument is unnecessary in this case, because the issue presented is straightforward and is fully addressed in the Tax Court's opinion and in this brief. Nevertheless, if the Court determines that argument is necessary, we stand ready to present oral argument on behalf of the appellee.

-i-

# TABLE OF CONTENTS

**Page**

Summary of the case and waiver of argument ........................................i

Table of contents ....................................................................ii

Table of authorities ..............................................................iv

Jurisdictional statement ...........................................................1

Statement of the issue ...........................................................2

Statement of the case .............................................................2

    A.    Hauptman's tax liability and the proposed levies .........3

    B.    Initial proceedings before the Tax Court and Hauptman's offer in compromise ...................................5

    C.    The IRS's consideration of the offer in compromise ........................................................................7

    D.    The supplemental notices of determination ................10

        1.    The Office of Appeals' findings concerning Hauptman's employment and tax liability .........11

        2.    The Office of Appeals' findings concerning Hauptman's entities and investments ...............12

        3.    The Office of Appeals' calculation of Hauptman's reasonable collection potential ......16

        4.    The Office of Appeals' reasons for upholding the rejection of Hauptman's offer in compromise ........................................................18

    E.    The Tax Court's opinion .............................................23

Summary of argument ........................................................26

Argument ............................................................................28

Appellate Case: 15-1071    Page: 3    Date Filed: 08/07/2015 Entry ID: 4303788

The IRS did not abuse its discretion by rejecting Hauptman's offer in compromise as not in the best interest of the Government ................................................................. 28

    Standard of review ................................................................. 28

        A.    Statutory and regulatory background ......................... 29

        B.    The Office of Appeals properly rejected Hauptman's offer on the basis of well-supported factual findings after satisfying all applicable statutory and regulatory requirements ....................... 33

        C.    Hauptman's contrary arguments are unavailing ........ 39

        D.    Hauptman's challenges to the calculation of his reasonable collection potential are both irrelevant and flawed ................................................................. 46

Conclusion ................................................................................... 50

Certificate of compliance ............................................................ 51

Certificate of service ................................................................... 52

Appellate Case: 15-1071    Page: 4    Date Filed: 08/07/2015 Entry ID: 4303788

# TABLE OF AUTHORITIES

**Cases:**                                                                **Page(s)**

*Bennett v. Commissioner,*
T.C. Memo. 2008-251, 2008 WL 4820794
(Nov. 6, 2008)..................................................................24, 31

*Christopher Cross, Inc. v. United States,*
461 F.3d 610 (5th Cir. 2006)..................................................34

*Dalton v. Commissioner,*
682 F.3d 149 (1st Cir. 2012) ...........................................35, 46

*Fargo v. Commissioner,*
447 F.3d 706 (9th Cir. 2006).................................................41

*Fifty Below Sales & Mktg., Inc. v. United States,*
497 F.3d 828 (8th Cir. 2007)............2, 28-31, 34, 35, 38-41, 47

*Gillum v. Commissioner,*
676 F.3d 633 (8th Cir. 2012).......................2, 28-30, 33, 35, 40

*Keller v. Commissioner,*
568 F.3d 710 (9th Cir. 2009).................................................47

*Kindred v. Commissioner,*
454 F.3d 688 (7th Cir. 2006).................................................31

*Living Care Alternatives of Utica, Inc. v. United States,*
411 F.3d 621 (6th Cir. 2005).................................................29

*Murphy v. Commissioner,*
469 F.3d 27 (1st Cir. 2006) ..................................................31

*Olsen v. United States,*
414 F.3d 144 (1st Cir. 2005) ...........................................28, 35

*Orum v. Commissioner,*
412 F.3d 819 (7th Cir. 2005).................................................34

*Roberts v. Commissioner,*
329 F.3d 1224 (11th Cir. 2003)..............................................29

*Scoville v. United States,*
250 F.3d 1198 (8th Cir. 2001)...............................................45

*Speltz v. Commissioner,*
454 F.3d 782 (8th Cir. 2006)............................2, 28, 29, 31, 41

-iv-

Cases (continued):                                                      Page(s)

*Tucker v. Commissioner,*
    506 F. App'x 166 (3d Cir. 2012) ............................................ 35
*Tucker v. Commissioner,*
    676 F.3d 1129 (D.C. Cir. 2012) ...................................... 46, 48
*United States v. Kapp,*
    564 F.3d 1103 (9th Cir. 2009) ............................................ 40

## Statutes:

26 U.S.C. (I.R.C.):
        § 61(a) ......................................................... 43
        § 6110(k)(3) ................................................. 40
        § 6321 ......................................................... 42
        § 6330 ..................................................... 2, 29
        § 6330(a)(1) ................................................. 29
        § 6330(a)(3)(B) ............................................ 29
        § 6330(b)(1) ................................................. 29
        § 6330(c)(2)(A)(ii) ........................................ 30
        § 6330(c)(2)(A)(iii) ....................................... 30
        § 6330(c)(2)(B) ............................................ 30
        § 6330(c)(3)(C) ....................................... 30, 33
        § 6330(d)(1) ................................................... 1
        § 6330(e)(1) ................................................. 29
        § 6331(b) ....................................................... 2
        § 7122 ...................................................... 2, 31
        § 7482(a)(1) ................................................... 2
        § 7483 ........................................................... 2
        § 7502(a)(1) ................................................... 1

Appellate Case: 15-1071     Page: 6     Date Filed: 08/07/2015 Entry ID: 4303788

**Regulations:**                                                   **Page(s)**

26 C.F.R. (Treas. Reg.):
§ 301.6330-1(b) ....................................................................... 29
§ 301.6330-1(d) ....................................................................... 29
§ 301.6330-1(e)(1) ................................................................... 32
§ 301.7122-1(a)(1) ................................................................... 31
§ 301.7122-1(b)(2) ................................................................... 30
§ 301.7122-1(c)(1) ........................................................ 23, 31, 33
§ 301.7122-1(f)(3) .................................................................... 31

**Rules:**

Fed. R. App. P. 13(a)(1) ....................................................... 2

Internal Revenue Manual:
§ 1.12.14.1.17(4) ................................................................... 32
§ 5.8.1.1.3(5) ................................................................... 32, 46
§ 5.8.5.5 (Sept. 23, 2008) ................................................. 48, 49
§ 5.8.5.6(1) (Sept. 23, 2008) ................................................... 50
§ 5.8.5.6.2 (Sept. 23, 2008) ..................................................... 50
§ 5.8.5.16 (Oct. 22, 2010) ........................................................ 48
§ 5.8.5.18 (Sept. 30, 2013) ....................................................... 48
§ 5.8.5.20.1 (Oct. 22, 2010) ...................................................... 50
§ 5.8.5.23(2)(a) (Oct. 22, 2010) ................................................. 50
§ 5.8.7.7(4) ................................................................... 32, 33
§ 5.8.7.7.1 ............................................................................. 40
§ 5.8.7.7.1(1) ............................................................. 24, 32, 33
§ 5.8.7.7.1(2) ........................................................................ 33
§ 5.8.7.7.1(3) ............................................................. 24, 32, 35
§ 5.17.2.5.7.2 ........................................................................ 45

Rev. Proc. 2003-71 ........................................................ 31, 32, 46

Appellate Case: 15-1071     Page: 7     Date Filed: 08/07/2015 Entry ID: 4303788

# JURISDICTIONAL STATEMENT

On November 19, 2007, the Commissioner of Internal Revenue ("Commissioner") sent petitioner-appellant Bruce A. Hauptman notices of determination upholding proposed levies on his properties to satisfy his delinquent federal income tax liability for 1992 through 1996. (App. 60-76; Ex. 81-J.)[1] On December 18, 2007, and December 19, 2007, Hauptman timely mailed to the Tax Court petitions (App. 7-27) seeking review of those determinations. *See* Section 6330(d)(1) of the Internal Revenue Code ("I.R.C.") of 1986 (26 U.S.C.); *id.* § 7502(a)(1) (timely mailing is timely filing). The Tax Court had jurisdiction over the petitions under I.R.C. § 6330(d)(1).

On October 15, 2014, the Tax Court issued final decisions permitting the Commissioner to proceed with the levies. (Add. 25-26.) Hauptman timely filed notices of appeal (App. 77-82) on January 12,

---

[1]    Citations to "App. __" are to the appendix filed contemporaneously with this brief, and citations to "Add. __" are to the addendum accompanying this brief. Citations to "Dkt. __" are to docket entries in *Hauptman v. Commissioner*, Tax Ct. No. 029857-07. Citations to "Ex. __" are to the exhibits filed with the parties' stipulation of facts (Dkt. 49). References to "Br. __" are to appellant's opening brief.

-1-

2015.  I.R.C. § 7483; Fed. R. App. P. 13(a)(1).  This Court has jurisdiction under I.R.C. § 7482(a)(1).

## STATEMENT OF THE ISSUE

Whether the Tax Court correctly held that the IRS did not abuse its discretion by rejecting Hauptman's offer in compromise as not in the best interest of the Government where Hauptman failed to report all of his taxable income, failed to disclose his financial situation fully to the IRS, and failed to prioritize the payment of taxes.  *See* I.R.C. §§ 6330 & 7122; *Gillum v. Comm'r*, 676 F.3d 633 (8th Cir. 2012); *Fifty Below Sales & Mktg., Inc. v. United States*, 497 F.3d 828 (8th Cir. 2007); *Speltz v. Comm'r*, 454 F.3d 782 (8th Cir. 2006).

## STATEMENT OF THE CASE

Hauptman commenced two Tax Court actions, which were consolidated, to challenge notices of determination in which the IRS upheld proposed levies on his property to satisfy his tax liabilities.[2] (App. 7-27.)  The Tax Court decided these cases on stipulated facts and

---

[2]  "The term 'levy' * * * includes the power of distraint and seizure by any means."  I.R.C. § 6331(b).

-2-

held that the IRS did not abuse its discretion in rejecting Hauptman's offer in compromise. (Add. 1-24.) It therefore decided that the Commissioner could proceed with the proposed levies. (Add. 25-26.)

## A. Hauptman's tax liability and the proposed levies

Hauptman is an investment consultant who, starting in 1984, "provid[ed] advice to high net worth individuals, pension funds, and institutions" through his firm B. Hauptman & Associates, LLC ("BHA"). (Add. 4; *see also* App. 62.) From 1989 to 1999, BHA managed client funds through Genesis Capital Fund, LP ("Genesis"). (Add. 4; *see also* App. 62-63.) Hauptman owned controlling interests in both Genesis and BHA through his full ownership of an S Corporation known as "Georgica Pond, Ltd." (Add. 4; App. 62; Ex. 76-J, at 11-12.)

BHA and Genesis were successful in the early 1990s. Genesis, which managed only $5.1 million in client funds when it began operating in 1989, held between $81.5 million and $169 million in client funds each year between 1992 and 1996, and it achieved returns of over 24% in three of those years. (App. 62-63; Ex. 76-J, at 12; *see also* Add. 4.) After 1996, however, BHA and Genesis saw a sharp decline in

-3-

business, and Genesis "ceased operations at the end of 1999." (Add. 5; *see also* App. 63.)

Between 1992 and 1996, the years in which BHA and Genesis were most successful, Hauptman did not timely file federal income tax returns. (App. 29.) After the IRS prepared substitutes for returns for tax years 1992 through 1995 on Hauptman's behalf, he did belatedly file returns for 1992 through 1996. (*Id*.) But Hauptman did not pay the amounts shown as due on the late-filed returns. (*Id*.) As a result, the Commissioner assessed Hauptman for those amounts. (*Id*.) As of March 30, 2007, Hauptman's outstanding income tax liability for tax years 1992 through 1996 totaled $13,052,711.30. (*Id*.) Hauptman does not contest any portion of that liability. (App. 30.)

On February 28, 2007, the IRS sent Hauptman a notice that it intended to use levies to collect his income tax liability for tax years 1992 through 1994. (App. 30.) The IRS also sent Hauptman a similar notice related to tax years 1995 and 1996. (*Id*.) Both notices informed Hauptman that he had the right to a collection due process ("CDP")

-4-

hearing before the IRS Office of Appeals to contest the appropriateness of the proposed levies. (*Id.*; *see also* Ex. 1-J, at 1; Ex. 2-J, at 1.)

Hauptman timely requested a CDP hearing to advance his view that "an offer in compromise should be accepted as a reasonable alternative to enforced collection." (Ex. 3-J, at 3; *see also* App. 30-31; Ex. 4-J, at 3.) At the conclusion of the CDP process, the Office of Appeals issued notices of determination upholding the proposed levies. (Ex. 24-J–25-J.)

## B. Initial proceedings before the Tax Court and Hauptman's offer in compromise

Hauptman filed petitions in the Tax Court challenging the notices of determination. (Dkt. 1; *see also* Tax Ct. No. 29868-07, Dkt. 1.) The Commissioner moved for summary judgment, and the Tax Court denied the motions. (App. 34.) The parties then "agreed that [Hauptman] would be allowed to submit an [offer in compromise]" for tax years 1992 through 1996. (*Id.*) The Tax Court granted a general continuance of the cases while the IRS considered that offer. (Dkt. 29; *see also* Tax Ct. No. 29868-07, Dkt. 30.)

Appellate Case: 15-1071    Page: 12    Date Filed: 08/07/2015 Entry ID: 4303788

On February 10, 2010, Hauptman submitted an offer concerning his liability for 1992 through 1996, which by that point exceeded $15.5 million in income tax, interest, and penalties. (*See* Ex. 76-J, at 1, 10.) Hauptman proposed to settle that liability by paying $500,000 within four months. (App. 34-35, 42-45.) With the offer, Hauptman submitted IRS collection information statements for himself, Georgica Pond, BHA, and other companies that he controlled, as well as personal and corporate tax returns and other financial records. (App. 35-37; *see also* Ex. 27-J; Exs. 28-J–64-J.)

On the collection information statements, Hauptman asserted that his assets included $376,456.36 in equity in his home, jewelry worth $25,542, and $78,805 in "antiques [and] furniture." (Ex. 27-J, at 5.) He claimed both that his living expenses totaled $10,873.55 per month and that his sole income was a $15,284 monthly distribution from "a one-time sale of stock" in a company known as Gayatri Partners, LLC. (*Id.* at 6-7.) And he assigned a value of just over $3 million to his various companies. (*Id.* at 3.)

-6-

Hauptman ascribed the vast majority of this amount—
$2,627,085—to Georgica Pond. (Ex. 27-J, at 3.) That value, in turn,
primarily reflected $2,596,885 in loans that Georgica Pond had made to
BHA. (*Id.* at 13.) Hauptman claimed that BHA, by contrast, was worth
only $47,561 (*id.* at 3), and that its sole assets comprised $382.62 in a
checking account and a $139 investment in Gamelan Capital Funds, LP
(*id.* at 20-21). The bills and credit card statements that Hauptman
submitted, however, showed both that Georgica Pond paid many of
BHA's bills and Hauptman's personal bills (*see* Exs. 33-J–35-J, 38-J–
41–J, 43-J–44-J, 47-J–58-J) and that BHA paid Hauptman's monthly
insurance premiums (*see* Ex. 31-J).

### C.    The IRS's consideration of the offer in compromise

After reviewing the administrative file, the IRS offer specialist
assigned to consider Hauptman's offer in compromise recommended
that the offer be rejected on the ground that "acceptance of the * * *
offer is not in the best interest of the government." (App. 47.) The
specialist reasoned that Hauptman had "an egregious history of past
non-compliance" and "ha[d] not reported any income" or paid any taxes
"for several years." (*Id.*) Instead, the specialist concluded, Hauptman

-7-

had caused "his entities" to pay his "[p]ersonal expenses" and fund a "lavish [lifestyle]" (*id.*) and then claimed on tax returns that those entities had suffered "very large losses" (Ex. 68-J, at 3.) In addition, the specialist noted that, despite claiming on the collection information statements that his entities were worth only $3 million, Hauptman had valued the same entities at $12 million on prior loan documents. (App. 47.)

After an IRS compliance manager reviewed the specialist's report (*see* Add. 8), the IRS sent Hauptman a letter rejecting the offer but stating that the offer had been "forwarded to an independent reviewer for review." (Ex. 69-J, at 1.) That reviewer agreed that the offer should be rejected. (App. 38.) On August 12, 2010, the IRS sent Hauptman a second letter reaffirming its view that "acceptance of [Hauptman's] offer would not be in the best interest of the government" and advising Hauptman that he could appeal to the IRS Office of Appeals "within 30 days." (App. 49.) Hauptman did so. (App. 38.)

The settlement officer assigned to consider Hauptman's appeal "tentative[ly] calculat[ed]" Hauptman's reasonable collection potential

-8-

to be $3,468,951, based on Hauptman's "equity in [his] various business assets." (Ex. 72-J; *see also* App. 53.)  The officer later agreed to reduce this amount to $2.9 million by "discount[ing] the value" of the loans made by Georgica Pond to BHA.  (Ex. 92-J, at 1.)  Hauptman pressed the officer to further reduce his collection potential by asserting that the same loan was worthless. (App. 53.)  The settlement officer declined to do so, because "the loans were made when [Hauptman's] taxes were due," "the loan funds could have been used to settle [his] outstanding tax liabilities," and "both Georgica Pond and BHA remained operating concerns."  (Add. 9; *see also* App. 52-53.)

Hauptman's appeal was eventually reassigned to a new settlement officer, who held extensive discussions with Hauptman and his representative.  (*See* App. 54-59; *see also* Ex. 82-J.)  During those discussions, Hauptman claimed that he paid his living expenses with loans from banks and private individuals.  (Add. 12; *see also* App. 55.)  Hauptman also admitted that, sometime after 2003, he made a charitable contribution of $400,000 to the Maharishis of Iowa despite his tax debts, because "he was confident that an investment he then

-9-

was concluding would permit him to pay his taxes in full." (Add. 10; *see also* App. 55.) And he admitted that he had valued his owned antiques and collectibles at $319,617 and his jewelry at $178,618 on a loan application but claimed that he had "puffed up" those figures. (App. 56; *see also* Ex. 13-J, at 10.) Following these discussions, the settlement officer determined that the rejection of the offer should be upheld. (App. 59.)

**D.    The supplemental notices of determination**

On July 2, 2012, the Office of Appeals sent Hauptman supplemental notices of determination rejecting the offer in compromise as not in the best interest of the Government. (App. 60-76; *see also* Ex. 81-J.) In an attachment to the supplemental notices (App. 62-76; *see also* Ex. 81-J, at 2-16), the Office of Appeals provided a detailed review of both the pertinent facts and its reasons for rejecting the offer.[3]

---

[3]    The attachment largely tracks the Appeals Case Memorandum prepared by the settlement officer (Ex. 76-J, at 11-23) and discussed in the Tax Court's opinion (Add. 13-14).

-10-

### 1. The Office of Appeals' findings concerning Hauptman's employment and tax liability

In the attachment, the Office of Appeals noted that, from 2007 through 2011, Hauptman received $7,500 per month in director's fees for his service as Executive Director of Matrixview, Ltd., a technology company involved in "the compression and transmission of * * * digital data."[4]  (App. 63, 66.)

The Office of Appeals next noted that Hauptman claimed his nonpayment of taxes "was not intentional" and that he was "delayed in filing his tax returns because he" was missing "information."  (App. 63-64.)  Hauptman said he was not "too concerned" about filing his returns, "because he believed that he had losses to offset any income"—but he then discovered that he owed taxes and could not pay them.  (App. 63.)

---

[4]     Hauptman reported these monthly director's fees as income received by his entity Georgica Pond.  (App. 66; *see also* Ex. 27-J, at 16.) The Office of Appeals, however, determined that Hauptman should have reported the fees as income on his personal tax return and that the fees "would be taxable" if Hauptman had done so.  (App. 66.)  By including the fees, instead, on Georgica Pond's return, Hauptman offset this personal income with expenses, including contractor fees and mortgage interest, that he caused Georgica Pond to incur.  (*Id.*; *see also* Ex. 85-J, at 1, 7.)

-11-

Even then, Hauptman decided to invest any available funds he had instead of paying down his tax liability "in hopes of making enough money to pay his taxes in full." (App. 64; *see also* App. 56; Ex. 87-J, at 3-5.) He was never able to do so, however, and his tax liability continued to grow. (App. 64.) As a result, in 1997, the IRS began to recoup Hauptman's liability through levies. (*Id.*) Hauptman admitted to the Office of Appeals that he then transferred his income and assets to Georgica Pond, using that company as a nominee to avoid further collection actions. (*Id.* at 4, 11; *see also* App. 56; Ex. 34-J–57-J; Ex. 68-J, at 4, 8.)

### 2. The Office of Appeals' findings concerning Hauptman's entities and investments

After verifying that the IRS had satisfied all legal and procedural requirements related to the proposed levies (App. 64-65), the Office of Appeals described Hauptman's financial relationships with the various entities in which he had interests during the years at issue (*see* App. 66-70). One such entity was BHA, which paid Hauptman's insurance premiums of $1,149.21 per month. (App. 74; *see also* Ex. 31-J.) BHA also paid employment taxes on a salary in 2011. (App. 67.) Hauptman

-12-

nevertheless claimed that BHA was "in a position to declare bankruptcy," "ha[d] no income," and used loans to pay its expenses. (*Id*.) Bank records and tax returns confirmed that the loans were from Georgica Pond. (App. 66, 74; *see also* Ex. 85-J, at 8.)

Another entity, Georgica Pond, paid many of Hauptman's personal bills, in addition to funding BHA. (App. 66.) It also owned real estate, including both Hauptman's "personal residence" and "the commercial building that housed [BHA]." (*Id*.) And Georgica Pond's bank statements "showed deposits totaling $835,727.10" in 2011. (*Id*.) That figure included $600,000 in loans made to various companies controlled by Hauptman that he then transferred to Georgica Pond and $235,000 in deposits from an unknown source. (*Id*.; *see also* App. 57-58.) From these deposits, Georgica Pond funded BHA and transferred $166,390.69 to Gamelan, LLC, another entity controlled by Hauptman. (App. 66, 68; *see also* App. 57-58.)

According to the Office of Appeals, Gamelan spent $50,000 to purchase a 2010 Mercedes-Benz for Hauptman's use. (App. 68; *see also* Ex. 13-J, at 14; Ex. 92-J, at 1.) Because Gamelan had no source of

-13-

income other than transfers from Georgica Pond, the Office of Appeals concluded that the funds for the car had come from Georgica Pond. (App. 68.) Yet another entity, Gayatri Partners, LLC, was formed by Hauptman in 2007 to purchase a $550,527.91 interest in Matrixview. Hauptman sold his Matrixview stock before November 2009 for $302,712. (App. 67-71; *see also* App. 55.)

Gaia Capital Holdings, LLC, a company in which Hauptman held an interest that he considered "to be his last remaining asset," invested in oil and gas partnerships and provided Hauptman with distributions from the partnerships. (App. 68; *see also* Ex. 27-J, at 3.) During the first nine months of 2011, Hauptman received $7,974.03 per month from these distributions. (App. 73.)

Hauptman had other investments in addition to these entities. In December 1999, Hauptman invested $1,079,705.00 in Terabeam Corp., which made telecommunication equipment. (App. 68.) According to Hauptman, Terabeam initially also attracted investment from other companies, including Lucent Technology. (App. 69.) When Terabeam then did poorly, Hauptman borrowed $500,000.00 and, through a new

-14-

company called "Bruce Hauptman Holding, LLC," purchased Lucent's interest in the company. (*Id.*) Through internet research, the Office of Appeals discovered that Hauptman then sold "all of his shares back to Terabeam" in 2003. (App. 68-69.) Hauptman's representative told the IRS that Hauptman received $2 million from the sale and used that amount to cover a "$650,000 loss in options/futures trading," to invest $950,000 "in a variety of partnerships," and to make a $400,000 "charitable contribution to the Maharishis of Iowa." (*Id.*; *see also* Ex. 13-J, at 8; Ex 68-J, at 20-21.)

In 2004, Hauptman invested $300,000 to purchase a 5% interest in Century Exploration International ("Century"), an oil and gas company. (App. 69; *see also* App. 55-56.) He ultimately sold that interest for a total of $1.3 million and thus netted $1 million from the investment. (App. 70.) The Office of Appeals found that Hauptman never "documented where the[se] capital gains were reported." (*Id.*; *see also* App. 56.) The Office of Appeals added that these were not the only investments Hauptman made; his "internet profile" listed several others. (App. 72.) Hauptman, however, did not provide details of any

-15-

other investments to the IRS. (*Id.*) He also initially failed to disclose the formation of two new entities—B. Hauptman Holdings, LLC, and Grand Teton Capital Management, LLC ("Grand Teton"). (App. 72, 75.)

### 3. The Office of Appeals' calculation of Hauptman's reasonable collection potential

The Office of Appeals calculated Hauptman's reasonable collection potential to be $12,156,983.35, a figure that comprises $223,153.44 in "[f]uture income" and $11,933,829.91 in "[n]et equity in assets." (App. 70, 73.) The figure for future income represents four years of income at $4,649.03 per month, *i.e.*, the $7,974.03 in monthly income that Hauptman received from Gaia distributions in 2011 less $3,325 in standard allowances for necessary living expenses. (App. 73.)

The Office of Appeals' calculation of Hauptman's assets included dissipated assets, *i.e.*, assets that Hauptman could have used to pay down his tax liability but, instead, spent, worth over $4.2 million. (*See* App. 70-72.) Those dissipated assets comprise: (1) the $1 million that Hauptman earned from the sale of his interest in Century but never reported as capital gains; (2) the $1.35 million portion of Hauptman's profit from the sale of Terabeam stock that he used to make new

-16-

investments or charitable contributions; (3) a $2 million investment in Lakshmi Ventures, Inc., that the Office of Appeals found Hauptman had made through Gamelan in 2002; and (4) the roughly $550,000 that he invested in Matrixview.[5]  (*Id.*)

The Office of Appeals also included in its calculation $6.6 million in assets held by B. Hauptman Holdings and Georgica Pond, which functioned as Hauptman's nominees.  (App. 71.)  It derived these additional assets from B. Hauptman Holdings' promissory notes of $4 million, issued by Hauptman as president, which represented the value of that company to be $4 million, and from Georgica Pond's loan of $2.6 million to BHA.  (*Id.*; *see also* App. 57.)  The Office of Appeals concluded that this $2.6 million, like the dissipated assets listed above, "could instead have been used to pay taxes."  (App. 71.)

The remainder of the assets consisted of real and personal property, including the proceeds from the sale of Hauptman's home

---

[5]  The Office of Appeals split the Matrixview investment into two components—the $302,712 that Hauptman received from the sale of his interest in Matrixview and the additional $247,538.91 that he had invested in the company.  (App. 70-71.)

-17-

($400,000), which he neither applied to his tax liability nor otherwise "accounted for." (App. 71.) It also included about $250,000 in antiques and collectibles and over $140,000 in jewelry.[6] (*Id*; *see also* App. 56; Ex. 68-J, at 4.) Finally, the Office of Appeals included $24,000 for a chandelier that Hauptman purchased for $15,000 and estimated was worth $30,000 (App. 71; *see also* App. 56) and $12,491 in cash and bank accounts (App. 70).

### 4. The Office of Appeals' reasons for upholding the rejection of Hauptman's offer in compromise

After reviewing all of these facts, the Office of Appeals upheld the decision to reject Hauptman's offer in compromise as not in the best interest of the Government. (*See* App. 73-76.) In doing so, it noted that rejections on that ground are made for reasons of "compliance and solvency," because "[t]he success of the offer[-in-compromise] program will be assured only if * * * taxpayers make adequate compromise

---

[6]     These figures represent the values Hauptman attached to his personal property on his earlier loan application, less both a 20% reduction and the encumbrances on the property. (App. 70-71.)

-18-

proposals consistent with their ability to pay and remain in compliance once their offer is accepted." (App. 73.)

The Office of Appeals found that Hauptman satisfied the solvency criterion, because he "has the ability to fund the $500,000.00 offer," but that he had not been "compliant in reporting and paying tax on his income." (App. 73.) The office noted that Hauptman had a "luxurious lifestyle," living until recently in an expensive home furnished with, among other things, the chandelier he bought for $15,000. (App. 73–74.) Nevertheless, Hauptman had not "paid any income taxes in the past ten years," because "[a]ny income reported on an income tax return is offset by losses." (*Id.*; *see also, e.g.*, Exs. 14-J–20-J, 61-J–64-J.)

The Office of Appeals found it "difficult to understand how someone could sustain enough losses to offset income over a ten-year period and still have money" to make continued investments, as Hauptman did. (App. 75.) This discrepancy was explained by Hauptman's use of his business entities as nominees to hold his assets and income, which enabled him to "offset any reported income with losses from one or more of his other investment opportunities" and to

-19-

"disguise[ ]" income as "loans that were later paid back." (App. 75-76.)

It also "ma[de] it difficult for the IRS to determine income that could be attributed to him." (App. 74.)

The Office of Appeals supported this analysis with six examples. (App. 74-75.) Those examples include Hauptman's formation of Gayatri Partners to purchase stock in Matrixview, which paid the director's fees that Hauptman earned to Georgica Pond. Georgica Pond in turn transferred money to BHA, which reported no income but nevertheless managed to pay $1,149.21 in monthly insurance premiums and other bills. (App. 74.) The examples also include Hauptman's use of Gamelan, an otherwise-defunct company formed to purchase an interest in Lakshmi Ventures, to buy a car with funds from Georgica Pond. (App. 74-75.)

In further support of its determination to uphold the rejection of Hauptman's offer, the Office of Appeals found that Hauptman had not fully disclosed his financial situation to the IRS during the CDP process. (App. 75.) It noted that Hauptman could not "verify that he [was] paying personal expenses through his personal bank account,"

-20-

rather than through Georgica Pond and other nominees. (*Id.*; *see also* App. 59.) The Office of Appeals reiterated that Hauptman had not initially disclosed the formation of either Grand Teton or B. Hauptman Holdings, LLC. (App. 75; *see also* App. 58.) And it noted that, although Hauptman claimed that he was "paying his personal expenses" with "private loans," Hauptman could produce the note for only a single $50,000 that had been made to him personally, rather than to his business entities. (App. 75.) And the proceeds of the loan had not been "deposited into [Hauptman's] personal bank account." (*Id.*)

Finally, the Office of Appeals found that Hauptman "ha[d] not placed a priority on payment of taxes." (App. 76.) It reasoned that Hauptman "had the opportunity to pay large sums of money toward his taxes" when he sold his interest in various companies, but that he "instead chose to use the money on [other] investment opportunit[ies]." (*Id.*) Moreover, although Hauptman asserted that "he was trying to earn enough money to pay his taxes in full," the Office of Appeals found that, if Hauptman had "focused his attention on paying * * * taxes[,] he

-21-

could have significantly reduced [his] tax liability while continuing his investment career." (*Id.*)

Based on these findings, the Office of Appeals sustained the rejection of Hauptman's offer as not in the best interest of the Government due to his lack of tax compliance.[7] It explained:

> The administrative file can establish that Mr. Hauptman and nominee's [*sic*] are not in compliance with all filing requirements. K-1's have not been properly issued to report income to Mr. Hauptman or other related nominee LLC's. Based on what is known, not all of the income earned by nominee entities have been reported on income tax returns. Income has been concealed in layers of business transactions between related LLC entities. Mr. Hauptman's use of nominee entities has made it difficult to determine the amount of capital gains actually earned. It is also believed that taxable events have been disguised as loans that were later paid back. Nominees have also been used to pay the expenses of Mr. Hauptman and other LLC entities also making it difficult to determine the net income of any one entity. It would not be prudent on the part of the IRS to accept an offer from Mr. Hauptman under these compliance conditions as it would only further encourage him to continue this course of action.

(App. 76.)

---

[7] The office observed that the offer also "could have been rejected" on "public policy or collect[ability]" grounds. (App. 76.)

Appellate Case: 15-1071    Page: 29    Date Filed: 08/07/2015 Entry ID: 4303788

### E. The Tax Court's opinion

After the Office of Appeals issued the supplemental notices of determination, the Tax Court restored Hauptman's petitions to its docket (Dkt. 42) and consolidated the petitions for trial (Dkt. 50). The parties then submitted the case for decision on stipulated facts under Tax Court Rule 122. (Add. 2.) The sole issue presented in the parties' briefs was whether the IRS abused its discretion by rejecting Hauptman's $500,000 offer in compromise. (*See* Dkt. 52-55.)

On October 9, 2014, the Tax Court issued a memorandum opinion upholding the Office of Appeals' determination that acceptance of the compromise would not be in the best interest of the Government and thus upholding the proposed levies. (Add. 1-24.) In doing so, the court recognized that "[t]he decision to accept or reject * * * an offer to compromise * * * is in the discretion of the Commissioner" (Add. 17 (citing 26 C.F.R. ("Treas. Reg.") § 301.7122-1(c)(1))) and that "due deference" is thus owed to the Commissioner's determination (*id*.). The court further recognized that "the Commissioner may reject * * * an offer-in-compromise if acceptance would not be in the best interest of the Government." (Add. 18 (citing Internal Revenue Manual ("I.R.M.")

-23-

§ 5.8.7.7.1(1)).)  And it noted that one situation in which such a rejection is proper exists where the taxpayer "'has an egregious history of past noncompliance'" and is "'highly unlikely * * * to remain in compliance during the offer period.'"  (Add. 19 (quoting I.R.M. § 5.8.7.7.1(3)).)

The Tax Court then held that the rejection of Hauptman's offer could not be seen as an abuse of discretion.  The court held that the governing Treasury Regulations "'do[ ] not compel the Commissioner to accept any particular offer," but only "to consider the facts and circumstances of the case before him,'" and that the IRS did so here.  (Add. 20 (quoting *Bennett v. Comm'r*, T.C. Memo. 2008-251, 2008 WL 4820794, at *5 (Nov. 6, 2008)).)  In support of that holding, the court found that the IRS considered the offer on the basis of a "fully developed record[ ]" and that it "thoroughly discussed the layering of [Hauptman's] business entities, the questionable documentation regarding [Hauptman's] loans, and the use of moneys * * * to pay [Hauptman] personal expenses."  (Add. 22.)

-24-

The Tax Court added that, as calculated by the IRS, Hauptman's "reasonable collection potential * * * greatly exceeded" the value of his offer.[8] (Add. 22.) The court explained that the settlement officer had given "cogent reasons as to why the loan[s]" from Georgica Pond to BHA should be included in the calculation of collection potential and that the IRS "had good reason to distrust" Hauptman's own valuations, given Hauptman's admission that he had previously provided false valuations of personal property "when it served his purposes." (*Id.*)

The Tax Court rejected Hauptman's challenge to the Office of Appeals' "conclusion that he is not or has not been in compliance * * * with his return filing and tax payment obligations." (Add. 23.) While the court acknowledged that Hauptman had "timely filed [f]ederal income tax returns for years after the years involved in these cases," it noted both that Hauptman had "failed to comply with his tax return filing and payment obligations throughout the years involved" and that

---

[8]     Without explanation, the Tax Court relied on the $2.9 million reasonable collection potential calculated by the settlement offer rather than the $12,156,983.35 collection potential calculated by the Office of Appeals. (*See* Add. 22.)

Appellate Case: 15-1071     Page: 32     Date Filed: 08/07/2015 Entry ID: 4303788

there was good reason for the Office of Appeals to conclude that Hauptman had not "give[n] the IRS complete and accurate information regarding his taxable income." (*Id.*) The court thus "f[ound] no error in [the Commissioner's] determination that [Hauptman's] questionable transactions with others call into question [his] future compliance." (Add. 24.) The Tax Court summarily rejected Hauptman's remaining arguments as "moot, irrelevant, or without merit." (Add. 24.)

The Tax Court entered decisions in favor of the Commissioner on October 15, 2014. (Add. 25-26.) Hauptman now appeals.

## SUMMARY OF ARGUMENT

The IRS did not abuse its discretion by rejecting Hauptman's offer in compromise. The Office of Appeals upheld that rejection in detailed supplemental notices of determination issued after a full consideration of all the relevant circumstances, and in those notices, the Office of Appeals expressly determined that the proposed levies were not overly intrusive. By doing so, it satisfied all applicable statutory and regulatory requirements.

Appellate Case: 15-1071    Page: 33    Date Filed: 08/07/2015 Entry ID: 4303788

Furthermore, the findings of fact on which the Office of Appeals based its decision—that Hauptman was not in compliance with the tax laws and had not reported all of his income on tax returns, that he did not fully disclose his financial situation during CDP proceedings, and that he did not prioritize the payment of taxes—have ample and undisputed support in the record. Hauptman admitted to the IRS that he used Georgica Pond as his nominee in order to hide his income and assets, and it is undisputed that he failed to report capital gains he made from investments, that he used Georgica Pond and other entities to pay his personal bills, and that he routinely transferred funds among those entities. It is also undisputed that, during the CDP process, Hauptman did not disclose to the IRS either the details of various investments or the existence of two new entities. And it is undisputed that Hauptman used millions of dollars he received from the sale of investments to make new investments and charitable contributions rather than to pay down his existing tax liability.

In short, the record compels the conclusions, reached by the Office of Appeals, that Hauptman concealed income and assets from the IRS

-27-

and disregarded his income tax obligations. Hauptman's brief on appeal nevertheless invites this Court to take on faith his own unsubstantiated statements that he has remained in full compliance with the tax laws. The Court should reject that invitation.

## ARGUMENT

### The IRS did not abuse its discretion by rejecting Hauptman's offer in compromise as not in the best interest of the Government

#### Standard of review

This Court's review of the Commissioner's determination to reject the offer in compromise and uphold the proposed levies "'is markedly deferential.'" *Gillum v. Comm'r*, 676 F.3d 633, 644 (8th Cir. 2012) (quoting *Fifty Below Sales & Mktg., Inc. v. United States*, 497 F.3d 828, 830 (8th Cir. 2007)). This review encompasses only the question whether the IRS "follow[ed] statutory and regulatory criteria in exercising its discretion" to reject the offer. *Speltz v. Comm'r*, 454 F.3d 782, 785 (8th Cir. 2006) (citing *Olsen v. United States*, 414 F.3d 144, 150 (1st Cir. 2005)). The Commissioner's determination may be disturbed "'only if it constituted a clear abuse of discretion in the sense of clear taxpayer abuse and unfairness by the IRS.'" *Gillum*, 676 F.3d at 644

-28-

(quoting *Fifty Below*, 497 F.3d at 830); *see also, e.g.*, *Speltz*, 454 F.3d at 784-85. This Court reviews the Tax Court's decisions de novo. *Gillum*, 676 F.3d at 644.

## A. Statutory and regulatory background

Section 6330 of the Internal Revenue Code provides safeguards for taxpayers in connection with the collection of taxes by levy. *See, e.g.*, *Living Care Alternatives of Utica, Inc. v. United States*, 411 F.3d 621, 624-25 (6th Cir. 2005); *Roberts v. Comm'r*, 329 F.3d 1224, 1227-28 (11th Cir. 2003). Before the IRS places a levy on a taxpayer's property, it must generally "notif[y]" a taxpayer "in writing" that he has the "right to a [CDP] hearing" with the IRS Office of Appeals to contest the proposed levy. I.R.C. § 6330(a)(1). The taxpayer then has 30 days to request a hearing. *Id*. § 6330(a)(3)(B). If a timely request is made, the taxpayer is entitled to a CDP hearing before the IRS Office of Appeals. *Id*. § 6330(b)(1); Treas. Reg. § 301.6330-1(b) & (d). The IRS is, as a general rule, prohibited from taking any action to enforce the proposed levy while the "hearing, and appeals therein, are pending." I.R.C. § 6330(e)(1).

-29-

At the CDP hearing, the taxpayer may raise "challenges to the appropriateness of [the] collection action[ ]." I.R.C. § 6330(c)(2)(A)(ii); *accord Gillum*, 676 F.3d at 644. The taxpayer may also "raise * * * challenges to the existence or amount of the underlying tax liability"— but only if he did not previously "have an opportunity to dispute such tax liability." I.R.C. § 6330(c)(2)(B). And the taxpayer may make "offers of collection alternatives," including "an offer-in-compromise." I.R.C. § 6330(c)(2)(A)(iii); *accord, e.g.*, *Gillum*, 676 F.3d at 644. Potential grounds for compromise include "[d]oubt as to collectability," which "exists in any case where the taxpayer's assets and income are less than the full amount of the liability." Treas. Reg. § 301.7122-1(b)(2).

During the CDP process, the IRS must determine "'whether any proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of the [taxpayer] that any collection action be no more intrusive than necessary.'" *Fifty Below*, 497 F.3d at 830 (quoting I.R.C. § 6330(c)(3)(C)) (alteration in original). It must also consider any collection alternatives proposed by the taxpayer and

-30-

"follow any applicable statutory or regulatory criteria that govern the question of whether to allow the [requested] alternative." *Id.* In the context of an offer in compromise, this means that the IRS must "evaluat[e]" the offer and, in doing so, must "consider[ ] * * * all the facts and circumstances, including whether the circumstances of a particular case warrant acceptance of an amount that might not otherwise be acceptable" under IRS policies and procedures. Treas. Reg. § 301.7122-1(c)(1) & (f)(3); *see also* Rev. Proc. 2003-71, § 9.01; *Murphy v. Comm'r*, 469 F.3d 27, 32 (1st Cir. 2006); *Bennett*, 2008 WL 4820794, at *5.

That said, "[t]he decision to entertain, accept or reject [the] offer is squarely within the discretion of the appeals officer and the IRS in general." *Kindred v. Comm'r*, 454 F.3d 688, 696 (7th Cir. 2006) (citing I.R.C. § 7122 and Treas. Reg. § 301.7122-1(c)(1)); *see also, e.g.*, Treas. Reg. § 301.7122-1(a)(1); *Speltz*, 454 F.3d at 784-85. The IRS may reject an offer on various grounds. An offer based on doubt as to collectability, for instance, may be rejected if it does not "equal or exceed a taxpayer's

Appellate Case: 15-1071    Page: 38    Date Filed: 08/07/2015 Entry ID: 4303788

reasonable collection potential." I.R.M. § 5.8.1.1.3(5); *see also id.*
§ 5.8.7.7(4).

An offer may also be rejected on the basis of "a determination that acceptance of the specific offer at hand is not in the 'best interest of the government.'" I.R.M. § 5.8.7.7.1(1); *see also* Rev. Proc. 2003-71, § 6.03. This basis for rejection reflects the IRS's ability to "take into account public policy and tax administration concerns in determining whether an offer to compromise is acceptable." Rev. Proc. 2003-71, § 6.03. In particular, to achieve "a compromise which is in the best interest of both the taxpayer and the [IRS]," taxpayers "are expected to provide reasonable documentation" and to "make adequate compromise proposals consistent with their ability to pay." I.R.M. § 1.2.14.1.17(4) (Policy Statement P-5-100); *see also* Treas. Reg. § 301.6330-1(e)(1).

A rejection of an offer as not in the best interest of the Government is therefore appropriate, among other situations, where a taxpayer has "an egregious history of past noncompliance, as evidenced by[his] failure to voluntarily file correct returns." *Id.* § 5.8.7.7.1(3). Nevertheless, such rejections are not "routine[, ] should be fully

-32-

supported by the facts outlined in the rejection narrative" (I.R.M. § 5.8.7.7.1(1)), and should be made only after "a calculation of the taxpayer's ability to pay [is] completed" (*id.* § 5.8.7.7.1(2); *see also id.* § 5.8.7.7(4)).

**B. The Office of Appeals properly rejected Hauptman's offer on the basis of well-supported factual findings after satisfying all applicable statutory and regulatory requirements**

Before rejecting Hauptman's offer as not in the best interest of the Government, the IRS was required generally to "consider[ ]" all the relevant "facts and circumstances." Treas. Reg. § 301.7122-1(c)(1). Before upholding the proposed levy, the IRS was also required to apply the "statutory balancing test" in I.R.C. § 6330(c)(3)(C) by weighing "the efficient collection of taxes" against "the legitimate concern of the [taxpayer] that any collection action be no more intrusive than necessary." *Gillum*, 676 F.3d at 644 (internal quotation marks omitted).

There can be no doubt that the Office of Appeals fulfilled both of these requirements. It expressly found that the balancing test in I.R.C. § 6330(c)(3)(C) weighed in favor of rejecting the offer, because accepting

-33-

the offer "would not represent efficient tax collection," and levy action is not "overly intrusive." (App. 76.) Before reaching this conclusion, it held extensive discussions with Hauptman and his representatives (*e.g.*, App. 51-59), reviewed the various documents Hauptman submitted (*id.*), and provided a lengthy statement detailing its reasons for rejecting the offer (*e.g.*, App. 62-76).

The reasoning behind the Office of Appeals' decision to reject Hauptman's offer was unimpeachable. It based that rejection on its findings that Hauptman had not complied with his income tax obligations—as illustrated by his failure to report all of his income— that Hauptman had not fully disclosed his financial circumstances during the CDP process, and that he had "not placed a priority on payment of taxes." (App. 73-76.)

There can be no doubt that the Office of Appeals could properly reject the offer on the basis of these findings. Both this and other courts have held that "noncompliance with current obligations" represents a "legitimate consideration[ ] weighing against accepting [an] offer." *Fifty Below*, 497 F.3d at 831 (citing *Christopher Cross, Inc. v. United States*,

-34-

461 F.3d 610, 613 (5th Cir. 2006), and *Orum v. Comm'r*, 412 F.3d 819, 820-21 (7th Cir. 2005)); *see also* I.R.M. § 5.8.7.7.1(3). A taxpayer's failure to "provide the settlement officer [with] all financial information necessary to evaluate his ability to * * * pay" also weighs against accepting an offer. *Gillum*, 676 F.3d at 646; *accord, e.g.*, *Olsen*, 414 F.3d at 157; *see also* I.R.M. § 5.8.7.7.1(3). So, too, does a taxpayer's choice to use funds for other purpose while "fall[ing] further and further behind" in the payment of taxes. *Fifty Below*, 497 F.3d at 831.

There is also no basis for setting aside any of the Office of Appeals' factual findings. This Court may take that step only if the findings are "contrary to the evidence." *Fifty Below*, 497 F.3d at 830; *see also, e.g.*, *Dalton v. Comm'r*, 682 F.3d 149, 155 (1st Cir. 2012); *Tucker v. Comm'r*, 506 F. App'x 166, 168 (3d Cir. 2012). And the findings at issue here are not only reasonable, but correct.

The Office of Appeals supported its finding that Hauptman had not reported all of his income with the conclusion that his "lifestyle does not coincide with the income he is reporting." (App. 73.) That conclusion is well grounded in the record. Hauptman's "luxurious"

-35-

lifestyle (*id.*) is shown by, among other things, his large, custom-built home (App. 74), the expensive furnishings in that home, which included a chandelier he purchased for $15,000 (App. 56, 74; Ex. 27-J, at 5), his $50,000 Mercedes (App. 68), and his claim that he has in excess of $10,000 in personal monthly expenses (Ex. 27-J, at 6). Hauptman had nonetheless avoided "pa[ying] any income taxes in the past ten years" by consistently offsetting any income he reported with losses. (App. 74.) Hauptman does not challenge the conclusion that he could not have maintained his lifestyle while still retaining money to invest over that ten-year period if he had, in fact, been losing money for the entire decade. (App. 75.)

As further support for its finding that Hauptman had not reported all of his income on tax returns, the Office of Appeals found that Hauptman had "established a 'layering' of business entities" to help hide income. (App. 74.) It provided concrete examples of this layering based on its review of Hauptman's bank records and the documents he submitted with his offer, including both (1) the transfer of funds from Georgica Pond to Gamelan to allow the latter to purchase a car for

-36-

Hauptman's use, and (2) Hauptman's decision to route the director's fees that he earned from Matrixview to Georgica Pond, which paid Hauptman's personal bills and also transferred money to BHA. (*Id.*; *see also* Exs. 27-J, 33-J–35-J, 43-J–44-J, 47-J–58-J.) Hauptman does not dispute the accuracy of the Office of Appeals' description of these transactions. He also does not deny that he concealed income from the IRS in more straightforward ways, including by failing to report his capital gains from the sale of his interest in Century (App. 70) and by using Georgica Pond to hold income and assets (*e.g.*, App. 64, 71).

The Office of Appeals' finding that Hauptman did not fully disclose his income and financial situation during the CDP process is supported by a similar wealth of evidence. For example, although Hauptman claimed that he was living off private loans, it is undisputed that Hauptman provided documentation for only one loan made to him personally and that the proceeds of that loan were never deposited in his bank account. (App. 75; *see also* App. 58.) It is also undisputed that Hauptman initially failed to disclose the existence of either B. Hauptman Holdings or Grand Teton (App. 75) and that he failed to

-37-

provide any information concerning various investments listed on his internet profile (App. 72).

Finally, there can be no question that Hauptman "has not placed a priority on payment of taxes." (App. 76.) Hauptman has admitted that he consciously chose to invest money instead of paying taxes in the hopes of "trying to hit a home run to pay his taxes in full." (*Id.*) In fact, the record shows that he invested a minimum of $4.88 million after incurring the tax liability at issue—$550,527.91 in Matrixview, $1,079,705 in Terabeam, $950,000 of the profit on Terabeam stock sales, $300,000 in Century, and $2 million in Lakshmi Ventures. (*See, e.g.*, App. 68-71.) And the record also shows that Hauptman gave at least $400,000 to a favored charity instead of paying down his tax liability. (*E.g.*, App. 72). For all of these reasons, the determination that acceptance of Hauptman's offer was not in the best interest of the Government does not represent an "abuse of discretion of any kind," much less "clear abuse of the taxpayer by the IRS." *Fifty Below*, 497 F.3d at 832.

Appellate Case: 15-1071    Page: 45    Date Filed: 08/07/2015 Entry ID: 4303788

### C.    Hauptman's contrary arguments are unavailing

Hauptman's arguments on appeal provide no plausible basis for disturbing the IRS's determination.  Hauptman first argues that the Office of Appeals could not reject his offer on the basis of non-compliance, because that rationale would "apply to every [offer] ever made" by a delinquent taxpayer.  (Br. 3.)  But that argument misconstrues the supplemental notices of determination.  The Office of Appeals did not base its rejection on the fact that Hauptman had failed to pay income tax during the years giving rise to the proposed levy.  Rather, it concluded that Hauptman had thereafter continued to violate his income tax obligations by failing to report all of his income in later years and by failing to pay down his liability when he had the means to do so.  (*See* App. 73-76.)  And as noted above, this Court has held that "noncompliance with current obligations" weighs against accepting an offer in compromise.[9] *Fifty Below*, 497 F.3d at 831.

_____

[9]    The Tax Court did state that Hauptman "failed to comply with his tax return filing and payment obligations throughout the years involved."  (Add. 23.)  It did so, however, only in noting that he had later failed to use available money to pay down his liability.  (*Id.*)  And

(continued…)

-39-

Hauptman next raises several procedural arguments, which are meritless. Hauptman argues that "[i]f the IRS was confident in" its view that he had not complied with his tax obligations, "it would audit [him] in order to support its allegations." (Br. 2; *see also* Br. 14-15, 18.) But the relevant statutes and regulations did not require the IRS to audit him for years after 1996 before rejecting his offer to compromise his liability for earlier years.[10]

Hauptman also argues that the Office of Appeals "failed to consider the facts involved as mandated" by I.R.M. § 5.8.7.7.1. (Br. 2.) That argument fails for three reasons. First, Hauptman forfeited this

---

(…continued)

the court also relied on the fact that Hauptman "did not give the IRS complete and accurate information regarding his taxable income." (*Id.*)

[10] Hauptman further asserts that the IRS audited BHA in 2014 and issued a "'[n]o [c]hange'" determination. (Br. 2.) But even if true, that assertion may not be considered on appeal. No change determinations "may not be used or cited as precedent." I.R.C. § 6110(k)(3); *accord United States v. Kapp*, 564 F.3d 1103, 1113 (9th Cir. 2009). Moreover, review of determinations made during CDP proceedings is generally "'limited to the administrative record before the appeals officer'" (*Gillum*, 676 F.3d at 643 (quoting *Fifty Below*, 497 F.3d at 829)), and the Office of Appeals, which issued the supplemental notices of determination rejecting Hauptman's offer in 2012 (*see* App. 60-76; Ex. 81-J), could not have considered a 2014 audit.

Appellate Case: 15-1071    Page: 47    Date Filed: 08/07/2015 Entry ID: 4303788

argument by failing to raise it in the Tax Court. *Speltz*, 454 F.3d at 786; *see* Dkt. 53-54. Second, the Internal Revenue Manual is merely for internal guidance of the IRS, meaning that it "does not have the force of law and does not confer rights on taxpayers." *Fargo v. Comm'r*, 447 F.3d 706, 713 (9th Cir. 2006) (citing further cases). Third, any contention that the Office of Appeals failed to consider the facts is, as shown above (at 33-38), "patently contrary to the record." *Fifty Below*, 497 F.3d at 832.

Hauptman argues that the IRS should have taken into account both his alleged payment of "$915,000 towards his tax liabilities during this period" and his act of "voluntarily s[elling] his home in order to use the proceeds to make payment to the IRS." (Br. 4.) Again, Hauptman forfeited these arguments by failing to raise them in the Tax Court. *Speltz*, 454 F.3d at 786. The arguments are also belied by the evidence. The official IRS transcripts in the record show that, as of April 30, 2008, Hauptman had made *no* voluntary payments toward his tax liability. (*See* Ex. 77-J.) And Hauptman cannot be given credit for offering to pay a settlement from the proceeds of his home, because the house was

-41-

encumbered by federal tax liens. (App. 71; Ex. 87-J, at 4.) The sale proceeds should thus have been directly applied against Hauptman's tax liability. *See* I.R.C. § 6321.

At bottom, Hauptman's complaint is not that the IRS failed to consider the facts, but that it declined to credit his "explanation and documentation." (Br. 2.) But nothing requires the IRS to believe self-serving statements made by a taxpayer, and here, as the Tax Court found, the Office of Appeals "had good reason to distrust [Hauptman's] financial statements." (Add. 22.) The grounds for doing so include the following: (1) Hauptman's failure to disclose income, the formation of new entities, and details about investments (App. 72, 75); (2) his concession that he had "puffed up" the values of his assets when it suited him (App. 56); (3) his undisputed and routine transfers of assets to and from Georgica Pond and other entities (App. 66-70, 74-75); (4) his failure to report capital gains from the sale of his interest in Century (App. 70); and (5) his use of entities that he claimed had no assets to pay for his personal expenses (App. 66-68).

Appellate Case: 15-1071     Page: 49     Date Filed: 08/07/2015 Entry ID: 4303788

Hauptman next makes various assertions intended to show that he was, in fact, compliant with the tax laws. Hauptman contends, for instance, that he and his entities timely "filed all tax returns from 1997 on." (Br. 4; *see also* Br. 14, 17.) Timely filing, however, was not Hauptman's only obligation under the Internal Revenue Code. He was also required, among other things, to report "all income from whatever source derived" (I.R.C. § 61(a)), and as shown above (at 35-37), the Office of Appeals correctly found that Hauptman had not fulfilled this responsibility.

Hauptman also argues that he was "compliant in reporting and paying tax on his income" (Br. 11; *see also* Br. 12), that all of his "income was offset by loss carry forwards" (Br. 9), and that he neither disguised income as loans nor used nominees to pay his income (Br. 13). To support these arguments, Hauptman points to the existence of both Georgica Pond's 2008 tax return and the collection information statements that he submitted with his offer (*see* Br. 12-13 (citing Exs. 27-J & 62-J)), but the fact that Hauptman submitted these documents does not speak to their accuracy. Hauptman also contends that a

-43-

"payment of personal living expenses" on Georgica Pond's 2008 return was not taxable because it "did not exceed [his] tax basis in" that company. (Br. 9.) Even if accurate, however, that single example provides no basis for disturbing the Office of Appeals' determination that Hauptman did not report all of his income. In fact, the example confirms that Hauptman used Georgica Pond to hold assets and pay personal expenses, and it thus supports the Office of Appeals' view that Hauptman concealed assets by transferring them among his various companies.[11]

Hauptman's remaining arguments should be summarily rejected. Hauptman's argument that he properly reported the income of Gamelan, a disregarded entity, on his personal tax return (Br. 17) does not address the Office of Appeals' concerns about Gamelan, which

---

[11]    Hauptman also asserts that each of his entities was originally formed for "a specific purpose" that has nothing to do with "conceal[ing] income." (Br. 12-13.) But it is clear that Hauptman repurposed various entities by, for example, having the otherwise-defunct Gamelan purchase a car (App. 66-68). And although Hauptman argues that his movement of loan funds does not show noncompliance (Br. 15-16), he provides no evidence to support that argument beyond the production of promissory notes, which do not show how he transferred or spent the loan proceeds (*see* App. 75).

-44-

revolve around Hauptman's transfer of funds from Georgica Pond to Gamelan in order to purchase a car (App. 68). Hauptman's further assertion that "[t]he IRS failed to make any prompt or reasonable decision[ ]" on an offer in compromise he made in 1997 (Br. 3) is irrelevant to the question whether the IRS properly rejected his 2010 offer.

And his argument that the supplemental notices of determination "do not contain any legal analysis to support the assertion that [Hauptman's] LLC entities * * * are his nominees" (Br. 17) has no force. It is settled that "[a] nominee is one who holds bare legal title to property for the benefit of another" (*Scoville v. United States*, 250 F.3d 1198, 1202 (8th Cir. 2001); *accord, e.g.*, I.R.M. § 5.17.2.5.7.2), and here, the Office of Appeals provided ample evidence that Hauptman used Georgica Pond and other entities as nominees to hold assets and income so that Hauptman could both avoid collection actions related to his liability for 1992 through 1996 and avoid paying taxes on his income in later years.

-45-

**D. Hauptman's challenges to the calculation of his reasonable collection potential are both irrelevant and flawed**

Hauptman also raises several challenges to the asset table that the Office of Appeals used in calculating his reasonable collection potential. (*See* Br. 18-28.) Those challenges are irrelevant, because the Office of Appeals did not base its rejection on collectability concerns. To be sure, the Office of Appeals concluded that it *could have* done so (App. 76), but as detailed above (at 18-22), it instead rejected the offer because Hauptman and his nominees were not in compliance with their tax obligations. Any errors on the asset table were thus immaterial to the decision to reject Hauptman's offer.

Hauptman's challenges to items on the asset table would be irrelevant even if the Office of Appeals had rejected his offer on collectability grounds. The IRS is "to accept [an offer in compromise] only where it reflects the taxpayer's 'reasonable collection potential.'" *Tucker v. Comm'r*, 676 F.3d 1129, 1135 (D.C. Cir. 2012) (citing Rev. Proc. 2003-71, § 4.02(2)); *accord, e.g., Dalton*, 682 F.3d at 157; I.R.M. § 5.8.1.1.3(5). Here, however, Hauptman's reasonable collection potential would exceed his $500,000 offer even assuming, *arguendo*,

-46-

that each of the specific items Hauptman challenges should have been excluded from the table. Hauptman implicitly concedes (Br. 18, 21, 26-27) three items on the asset table—the $400,000 that he earned from the sale of his home, the additional $400,000 that he donated to charity instead of paying in partial satisfaction of his tax liability, and the roughly $550,000 he invested in Matrixview. (*See* App. 70-71.) These assets alone have a value of over $1.35 million—more than twice the amount of Hauptman's $500,000 offer. Hauptman's arguments therefore cannot show that the Office of Appeals abused its discretion. *Keller v. Comm'r*, 568 F.3d 710, 718 (9th Cir. 2009).

In any event, Hauptman has not shown that any of the values used by the Office of Appeals are "contrary to the evidence." *Fifty Below*, 497 F.3d at 830. Hauptman contends that "all relevant assets have been liquidated at values substantially less than assigned by the IRS" (Br. 4; *see also* Br. 25-26), but he does not, and cannot, identify any record evidence to support that contention. For example, Hauptman challenges (Br. 18–19) the Office of Appeals' decision to treat as a dissipated asset the $950,000 that he received from the sale of

-47-

Terabeam stock and then reinvested—which is to say, to treat that amount as an asset that was "no longer available to pay" Hauptman's tax liability because it had been "sold, gifted, transferred, or spent on non-priority items or debts." I.R.M. § 5.8.5.5 (Sept. 23, 2008).[12] That decision was correct: Hauptman spent the money not—as he now claims (Br. 18)—to earn a living, but rather in the alleged hope of earning enough to pay off his liability all at once, rather than piecemeal (Ex. 68-J, at 6–7). And that excuse is insufficient to prevent the $950,000 from being treated as a dissipated asset. *Tucker*, 676 F.3d at 1136.

Hauptman also challenges (Br. 19-20) the decision to include the $2 million investment in Lakshmi Ventures as a dissipated asset, but he forfeited that challenge by failing to raise it in the Tax Court (*see*

---

[12]    The provisions of the Internal Revenue Manual concerning dissipated assets have been revised since the IRS first rejected Hauptman's offer. *See* I.R.M. § 5.8.5.16 (Oct. 22, 2010); I.R.M. § 5.8.5.18 (Sept. 30, 2013). Hauptman does not argue that the changes to those provisions are relevant to this appeal.

-48-

Dkt. 53-54).[13] The IRS considered and rejected Hauptman's argument that the loans from Georgica Pond to BHA are uncollectable because both BHA and Georgica Pond remained going concerns. (App. 71.) Given Hauptman's routine concealment of income and his free transfer of funds among his various companies, the finding that the loans could be repaid is not contrary to the record.[14] And Hauptman's challenges to the values that the IRS ascribed to B. Hauptman Holdings (Br. 27-28) and to his personal property (Br. 24-26) should be rejected on the ground that the values used by the Office of Appeals were based on

---

[13] Furthermore, although Hauptman's argument turns on the supposedly different ownership structures of Gamelan, LLC and Gamelan Capital Fund, LP, there is, contrary to Hauptman's assertion (Br. 19), no evidence that he attempted to explain this purported distinction to the IRS (*see, e.g.*, Ex. 84-J).

[14] If they were uncollectable, the loans would constitute a dissipated asset, because Georgica Pond, which functioned as Hauptman's nominee, made the loans to BHA at a time when the money "could have instead * * * been used to pay [Hauptman's] taxes." (App. 71; *see also* I.R.M. § 5.8.5.5 (Sept. 23, 2008).)

Appellate Case: 15-1071     Page: 56     Date Filed: 08/07/2015 Entry ID: 4303788

Hauptman's own statements on loan applications and in discussions

with the IRS.[15]  (App. 71; Ex. 13-J, at 10.)

## CONCLUSION

The decisions of the Tax Court should be affirmed.

Respectfully submitted,

CAROLINE D. CIRAOLO
  *Acting Assistant Attorney General*

/s/ Richard Caldarone

| JOAN I. OPPENHEIMER | (202) 514-2954 |
| RICHARD CALDARONE | (202) 514-2947 |

  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

AUGUST 2015

---

[15]    Hauptman also asserts, without elaboration, that the IRS incorrectly calculated his future income.  (Br. 29.)  The IRS, however, followed the Internal Revenue Manual by calculating Hauptman's monthly income to be his reported income, less standard allowances for necessary expenses, and by extrapolating that income over a 48-month time frame.  *See* I.R.M. §§ 5.8.5.6(1) & 5.8.5.6.2 (Sept. 23, 2008); *see also* I.R.M. §§ 5.8.5.20.1 & 5.8.5.23(2)(a) (Oct. 22, 2010).

Appellate Case: 15-1071    Page: 57    Date Filed: 08/07/2015 Entry ID: 4303788

# CERTIFICATE OF COMPLIANCE

## With Type-Volume Limitation, Typeface, Type Style, and Virus Scanning Requirements

    1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    [X] this brief contains __9,591__ words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [ ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

    2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [X] this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook, *or*

    [ ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

    3. Pursuant to Eighth Circuit Rule 28A(h)(2) and 28A(g)(5), I further certify that the brief and addendum have been scanned for viruses using System Center 2012 Endpoint Protection program (updated daily), and that, according to the program, no viruses were detected.

  __/s/Richard Caldarone__

-51-

Appellate Case: 15-1071   Page: 58   Date Filed: 08/07/2015 Entry ID: 4303788

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of August, 2015, I electronically filed a PDF version of the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system.

/s/ Richard Caldarone

Appellate Case: 15-1071    Page: 59    Date Filed: 08/07/2015 Entry ID: 4303788